## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

TYRONE CLARK,             )

                              )

Plaintiff,                 )

                              )     Civil Action No. 1:24-cv-12389

v.                       )

                              )

CITY OF BOSTON, et al.       )

                              )     **Jury Trial Demanded**

Defendants.           )

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF BOSTON'S MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff, TYRONE CLARK, under Federal Rule of Civil Procedure 12, responds to Defendant City of Boston's (COB or Boston) motion to dismiss (Dkt. Nos. 29, 30) as follows:

### INTRODUCTION

Plaintiff seeks redress for decades of wrongful imprisonment for crimes he did not commit. Boston police officers Farrell, Twohig and Underwood ("Officers") secured his conviction by (1) fabricating inculpatory "evidence" from a "confidential informant"; (2) using suggestive identification tactics; and (3) suppressing exculpatory evidence that Plaintiff could have used to establish his innocence. COB caused Plaintiff's wrongful imprisonment through its deficient policies and failing to train and supervise its officers. Plaintiff brings viable claims against COB.

### BACKGROUND

#### A. The Underlying Crime and Investigation

On June 23, 1973, an unknown assailant kidnapped, robbed, and raped Anne Kane. Dkt. No. 27, ¶¶24, 27. After the initial assault, the assailant took Ms. Kane around Boston, where the assailant raped Ms. Kane again before she escaped. *Id.*

Plaintiff Tyrone Clark is innocent of any crime against Ms. Kane. *Id.*, ¶1. But Officers, looking to "solve" the crime quickly, falsely named him as a suspect and shaped the evidence to fit

him. *Id.*, ¶2. Immediately after the attack, Ms. Kane described her attacker to the police at the station as an "unknown colored male, 20 yrs., 5-10, slim build, 160 lbs., dark skin, short hair, wearing a black bush hat, striped shirt, blue jeans, and "high-heeled shoes." *Id.*, ¶¶28-29. This did not match Plaintiff, who was 5' 6" and weighed only 127 pounds. *Id.*, ¶¶30, 59. The Officers fabricated his height and weight to make it seem less distinct from Ms. Kane's original description—they described him as 5' 7" tall and weighing 135 lbs. *Id.*, ¶¶57-58.

The following day, the Officers brought Ms. Kane to look at "hundreds" of "mugshots" of Black men. *Id.*, ¶34. Plaintiff's photo was included, but Ms. Kane did not identify his photo as resembling her assailant. *Id.*, ¶35.

Two days after the attack, the Officers and Ms. Kane retraced her attacker's route. *Id.*, ¶41. Underwood claimed to recognize a "colored male approximately 16 years of age" whom he falsely described as a "police informant." *Id.*, ¶46. Underwood falsely claimed that the "informant" provided the name "Tyrone Clark." *Id.*, ¶47. Underwood did not document any information to allow for any examination of the purported "informant evidence." *Id.* The Officers used this false "informant" "evidence" to pursue Plaintiff for the crimes. *Id.*, ¶¶44-49.

Farrell showed Ms. Kane a suggestive photo array that included Plaintiff's photo as the target. *Id.*, ¶50-51. The Officers used this photo lineup to falsely suggest Plaintiff was the perpetrator. *Id.*, ¶¶3, 52. Succumbing to the suggestion, Ms. Kane picked Plaintiff's photo. *Id.*, ¶53.

Farrell brought Ms. Kane to court, where he conducted an unrecorded and highly suggestive show-up procedure. *Id.*, ¶¶ 54, 60-62, 71. He had Ms. Kane view Plaintiff at the defense table, demonstrating to her that the police believed Plaintiff was the culprit. *Id.*, ¶61. Despite the suggestion, Ms. Kane said that Plaintiff looked so different from her attacker. *Id.*, ¶72. The investigators never disclosed that statement or the show up itself. *Id.*

After he was taken into custody, Plaintiff was forced to strip at the police station, and Farrell

found no wounds on Plaintiff's back where Ms. Kane claimed to have stabbed her attacker. *Id.*, ¶56. Also, even though the attacker had cut his hand on a knife, Plaintiff had no hand injuries. *Id.*, ¶57.

BPD officers failed to secure the crime scene and did not even enter Ms. Kane's apartment until two days after the attack. *Id.*, ¶¶32-34. The apartment contained critical evidence, including a bloody towel the assailant had used, a pair of male socks, and a knife with which the victim had attempted to stab the assailant in the back and on which he had cut his hand. *Id.*, ¶32.

The Officers hid exculpatory evidence from Plaintiff and prosecutors. *Id.*, ¶5. First, they never disclosed that Ms. Kane told them that Plaintiff "looks so different" from the perpetrator. *Id.*, ¶72. Second, the Officers destroyed the treasure trove of physical evidence from the crime scene (including the victim's underwear, male socks, and the bloody towel) and the biological evidence that could prove Plaintiff's innocence. *Id.*, ¶73.[1] There was no physical or forensic evidence introduced against Plaintiff at trial. With only the fabricated "identification" "evidence" presented and exculpatory evidence improperly suppressed, Plaintiff was charged, prosecuted, and wrongly convicted of rape, robbery and kidnapping. *Id.*, ¶6.

**B. Officers Implemented COB's Deficient Policies and Practices**

The Officers' actions stemmed from COB's flawed policies. *Id.*, ¶¶7, 8, 99-100. During this investigation, BPD operated under written policies from 1950. *Id.*, ¶99(a). These Rules and Regulations failed to address contemporary law enforcement issues and lacked sufficient detail on relevant matters, including important constitutional requirements that had been clarified between 1950 and 1973. *Id.*, ¶99. The inadequacies of these outdated policies were particularly egregious because BPD maintained an unwritten custom or policy not to investigate exculpatory evidence and

---

[1] One item of evidence that was not destroyed or hidden by police, the handle from the knife used to stab the attacker, was exculpatory: it was later found to have male DNA on it that excluded Plaintiff as the source. *Id.*, ¶74. It follows that the remaining physical evidence would likely have been exculpatory if not destroyed and/or hidden by police. *Id.*

to withhold it from criminal defendants. *Id.*, ¶99(b).

BPD also failed to have policies to prevent the false introduction of evidence from confidential informants or any policies at all about the use of informants. *Id.*, ¶99(b)(c). BPD, therefore, maintained policies and/or customs that allowed officers to fabricate the existence of "confidential informant" evidence to introduce false evidence against officers' chosen suspects. *Id.*, ¶¶8, 99. This allowed the Officers to manufacture the existence of an informant as the purported source of the investigation of Plaintiff. *Id.*, ¶¶4, 8, 46-47, 102.

BPD also failed to have a policy to prevent suggestive identification procedures despite the obvious need for one. *Id.*, ¶99(c). Farrell's highly suggestive and secretive show-up was a direct result of BPD's failure to have such a policy. *Id.*, ¶¶61-62, 102.

BPD had no policies that required officers to disclose exculpatory and/or impeachment evidence to state prosecutors and/or criminal defendants, thereby giving officers complete discretion about whether to do so. *Id.*, ¶99(d). This resulted in a standard practice not to disclose exculpatory and/or impeachment evidence. *Id.*, ¶¶99(d) and (f). This practice was consistent with BPD's widespread culture, known by COB policymakers, that officers were in the business of arresting potential criminals, and would not help suspects by disclosing exculpatory evidence. *Id.*, ¶99(f). These policies and practices led the Officers to suppress exculpatory evidence here. *Id.*, ¶102.

BPD's widespread practice and/or policy not to investigate exculpatory evidence and to withhold it from criminal defendants and prosecutors was directly contrary to the Suffolk County District Attorney's office's (SCDAO) standing policy to disclose all known exculpatory and impeachment evidence to accused persons. *Id.*, ¶102.[2] SCDAO was unable to disclose exculpatory

---

[2]  At the time, the officer assigned to a case determined what material from the file to disclose to the prosecution and provided the materials to his supervisor, who in turn would provide it to his superiors up the chain of command. *Id.*, ¶108. This process allowed BPD various opportunities to exclude exculpatory evidence without SCDAO's knowledge. *Id.*

and/or impeachment evidence to Plaintiff because the Officers failed to disclose that evidence. *Id.*

Moreover, COB policymakers failed to supervise and train officers about: (1) proper identification techniques; (2) the collection and preservation of physical evidence; (3) the handling of exculpatory evidence; and (4) the government's obligation to disclose it to criminal defendants. *Id.*, ¶103. Further, COB policymakers failed to discipline officers who withheld or fabricated evidence. *Id.*, ¶7. Such inadequate training, supervision, and discipline reflected COB's deliberate indifference to the risk of convicting an innocent person like Plaintiff. *Id.*, ¶103.

COB had notice that its officers and agents deprived individuals suspected of criminal activity of exculpatory evidence; subjected them to criminal proceedings based on false evidence; and deprived them of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence suggesting their involvement. *Id.*, ¶104. COB policymakers directly encouraged and were thereby the moving force behind the very type of misconduct at issue. *Id.*, ¶105.The widespread practices of withholding material evidence and fabricating false evidence and witness testimony—which were so well settled as to constitute the *de facto* policy of COB—flourished because municipal policymakers exhibited deliberate indifference to the problem. *Id.*, ¶106.[3]

Finally, the constitutional violations were committed with the knowledge or approval of people with final policymaking authority or were committed by persons with final policymaking authority. *Id.*, ¶107. Thus, the misconduct occurred under COB's policies and practices. *Id.*

### C. Plaintiff's Damages and Exoneration

Plaintiff served over 47 years in prison for crimes he did not commit. *Id.*, ¶¶12, 17. He spent

---

[3] COB promulgated deficient policies, and procedures governing witness interviews, lineups, preserving and disclosing investigative materials and evidence, in-court testimony, and training, supervision, and discipline of employees and agents of COB, including employees and agents of the BPD. *Id.*, ¶100. BPD, including the Officers, implemented these policies and procedures when investigating crimes. *Id.*, ¶101.

the prime years of his life imprisoned in harsh conditions, facing physical and emotional threats, violence, harassment, and/or terror, which caused profound damage. *Id.*, ¶12, 67-70, 82, 85. Plaintiff never stopped professing his innocence during his long fight for justice. *Id.*, ¶¶10, 68. P

Plaintiff was finally vindicated when the Suffolk Superior Court vacated his rape conviction on November 24, 2021, and his convictions for kidnapping and robbery on August 24, 2023. *Id.*, ¶75. The court granted his motions for new trial based on questions regarding the fairness of the investigation and police mishandling of evidence. *Id.*, ¶11.

## ARGUMENT

COB is not entitled to dismissal of Plaintiff's claims. In deciding whether to dismiss a complaint under Rule 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citations omitted). Under Rule 8, a complaint need only provide the defendants with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs are given flexibility: "It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint. A full description of the facts that will prove the plaintiff's claim comes later, at the summary-judgment stage or in the pretrial order." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (citation and internal quotation marks omitted).

To survive a motion to dismiss, a complaint needs only to state a claim that is plausible on its face. *Twombly*, 550 U.S. at 570. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. Dismissing a complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004) (citations omitted). Moreover, where, as here,

circumstances show that the defendants have sole possession of relevant information, pleading standards are relaxed. *See, e.g., Boykin v. KeyCorp*, 521 F.3d 202, 215 (2nd Cir. 2008) (involving a post-*Twombly* challenge). Plaintiff's Complaint passes the standards required by the Rules.

### A. Plaintiff Properly Pleads Claims Against Defendant City of Boston

COB is liable under §1983 for constitutional violations suffered by Plaintiff that were caused by its express policies or omissions of policy, the actions of its final policymakers, its failure to train or supervise employees, or a widespread custom or practice under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658, 690-91 (1978); *Haley v. City of Boston*, 657 F.3d 39, 51-53 (1st Cir. 2011); *see also Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*). Plaintiff properly pleads that the violations of his right to due process were caused by COB's: (1) custom, policy, and practice of allowing officers to fabricate inculpatory evidence (including eyewitness and "confidential informant" evidence) and to withhold exculpatory evidence from the defendant; (2) failure to train and supervise its officers; and (3) omission of needed policies governing disclosing and preserving evidence, conducting fair identification procedures, and interviewing witnesses.

Defendant's primary contention is that Plaintiff has not sufficiently pled his *Monell* claim. But it fails to cite one case that relates to pleading standards for those *Monell* claims (except an unpublished case that summarily dispatched a *pro se* pleading). Dkt. No. 30, at 7-9. Rather, COB presents cases related to trials and summary judgment and discusses proof that is needed to reach a *Monell* judgment. *Id.* COB thereby puts the cart before the horse. In the current posture, Plaintiff does not have to *prove* his claims.

Perhaps more tellingly, Defendant's argument completely ignores the substance of *Haley v. City of Boston* (citing it only for procedural propositions), which is the authoritative treatment of *Monell* claims at the pleading stage in this Circuit. Plaintiff's allegations here closely mirror those in *Haley*, which the First Circuit found sufficient. *See Haley v. City of Boston*, 657 F.3d 39, 51-53 (1st Cir.

2011); *see also Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 91–92 (D. Mass. 2019) (applying *Haley* to analogous facts and denying motion to dismiss).

**1. Plaintiff alleges *Monell* liability based on COB policies and practices.**

Plaintiff properly alleges that COB had widespread policies and/or practices allowing BPD officers to fabricate evidence and withhold material exculpatory evidence. Dkt No. 27, at ¶¶99-102, 104-109. Specifically, BPD policy permitted officers to withhold exculpatory and/or impeachment evidence from a defendant, which directly contradicted the SCDAO's standing policy on disclosure. *Id.*, at ¶102. As a result, in repeated instances, including on multiple occasions in this case, BPD officers deliberately suppressed investigative materials; fabricated identification and informant evidence; failed to maintain or preserve evidence; and pursued wrongful convictions through profoundly flawed investigations. *Id.*

In *Haley*, the First Circuit weighed virtually identical allegations to those made in Plaintiff's complaint. Haley was wrongly convicted in the early 1970s (like Plaintiff) and served decades in prison before being exonerated (like Plaintiff) when evidence revealed that Boston police had suppressed exculpatory statements (like here) from two key witnesses who had implicated Haley. *Id.* at 43-45. Haley sued the officers who investigated the case and COB. He alleged, among other things, that the BPD had a "standing policy" of withholding exculpatory evidence, the policy was "designed to encourage successful prosecutorial outcomes," and the BPD's policy diverged from that of the SCDAO. *Id.* at 51-52. Plaintiff alleges the same facts here. *See* Dkt No. 27, at ¶102.

The First Circuit held that Haley plausibly stated a *Monell* claim that "implicates the [COB's] standing policy itself" and thus might render Boston liable on a theory "that a particular municipal action itself violates federal law[.]" *Haley*, 657 F.3d at 51-52. As in *Haley*, Plaintiff here sets forth a plausible claim for municipal liability. *See Haley*, 657 F.3d at 52; *see also Mazza v. City of Boston*, No. 24-10333-NMG, 2024 WL 4505328, at *4 (D. Mass. Oct. 15, 2024) (relying on *Haley* to find analogous

allegations related to BPD practices and policies "sufficient to state a plausible *Monell* claim");

*Echavarria v. Roach*, No. 16-cv-11118-ADB, 2017 WL 3928270, at *5 (D. Mass. Sept. 7, 2017).

**2.  Plaintiff alleges plausible *Monell* theory based on COB's failure to train/supervise.**

Plaintiff also claims that COB failed to sufficiently supervise and train its police officers. Dkt.

No. 27, at ¶103. This is a proper stand-alone *Monell* theory. COB may be liable for failure to

train/supervise if it knew or should have known that its supervision and/or training was inadequate

but showed "deliberate indifference" to the effects of those inadequacies by failing to implement

supervision or training. *Young v. Providence*, 404 F.3d 4, 25-29 (1st Cir. 2005); *see also Haley*, 657 F.3d at

52. The *Haley* plaintiff alleged, for example, that "the City failed to train its personnel in their

evidence disclosure obligations despite notice of persistent and ongoing violations." *Haley*, 657 F.3d

at 51. Although the First Circuit noted that the plaintiff would need to develop evidentiary support

in discovery, it held that the allegations themselves were sufficiently pled. *Id.* The same result is

appropriate here because Plaintiff's allegations are analogous to those in *Haley*.

Ignoring this precedent, COB argues that Plaintiff's failure to train/supervise *Monell* theory

cannot survive a motion to dismiss without allegations of a pattern of similar misconduct. Dkt. No.

30, at 12-13. The Supreme Court, however, has held that prior instances of misconduct are not

always required for failure to train claims. *See Bd of County Commissioners of Bryan County v. Brown*, 520

U.S. 397, 409 (1997); *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). Rather, municipal liability

attaches without a pattern of similar constitutional violations, so long as it was obvious that a failure

to supervise or train on a subject was likely to lead to the violation of constitutional rights. *City of

Canton v. Harris*, 489 U.S. at 390; *Young*, 404 F.3d at 28-29. In fact, Courts have repeatedly held that

plaintiffs can survive summary judgment on a single-incident failure to train *Monell* claim regarding

*Brady* because the failure to train  has the "highly predictable consequence" that a plaintiff's due

process rights will be violated. *See Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993)

(*per curiam*); *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

Courts in this Circuit recognize the viability of deliberate indifference claims without showing a prior pattern of constitutional violations based on the obvious need for training/supervision. *See Young*, 404 F.3d at 28 ("We have stated that '[t]he Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of previous constitutional violations.'") (quoting *Swain v. Spinney*, 117 F.3d 1, 11 (1st Cir.1997) (citing *Brown*, 520 U.S. at 409)); *see also Echavarria v. Roach*, 565 F.Supp.3d 51, 91 (D. Mass. 2021). In E*chavarria*, relying on *Connick v. Thompson*, 563 U.S. 51, 64 (2011),[4] the Court allowed a *Monell* claim to proceed to trial under a failure to train/supervise theory related to *Brady*. It found that, even in the absence of a pattern of prior misconduct, "a reasonable jury could find that failing to train officers on their obligations to disclose exculpatory evidence leads to the highly predictable consequence that officers will not disclose exculpatory evidence." *Id.* The Court noted that police officers are not trained in the law, and it is obvious that they require training to comply with disclosure requirements. *Id.*

Here, Plaintiff alleges that the constitutional violations caused by COB's failure to supervise and train investigators about their *Brady* obligations were so obvious as to require the BPD to provide those safeguards. It was readily apparent to COB that its failure would cause and had caused constitutional injuries in criminal investigations and prosecutions like the harm suffered by Plaintiff. *See* Dkt. No. 27, at ¶104.[5] Plaintiff plausibly alleges that COB's deliberate indifference to the need to

---

[4] In *Connick*, 563 U.S. 51 (2011), the Court contemplated a situation presented here: failure to train officers regarding their *Brady* obligations. The Court found no single-incident liability for failure to train *prosecutors* about *Brady* because prosecutors are legally trained and familiar with *Brady*. *Connick*, 563 U.S. at 63-71. The Court expressly distinguished attorneys from police officers: "The reason why the *Canton* hypothetical is inapplicable is that attorneys, *unlike police officers*, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 69-70 (emphasis added); *id.* at 63 (explaining that legal training differentiates attorneys from other public employees).

[5] This case is distinguishable from the unpublished case of *Mazza v. City of Boston*, in which the plaintiff failed to plead plausible *Monell* claims based on a failure to train/supervise theory. *See* 2024 WL 4505328. In *Mazza*, the plaintiff did not sufficiently allege "deliberate indifference" by COB

supervise and/or train its officers caused Plaintiff's injuries. *See Young*, 404 F.3d at 28-29.

### 3. Plaintiff properly alleges *Monell* claims based on COB's omission of needed policies.

Plaintiff alleges that COB failed to promulgate needed policies requiring the disclosure of exculpatory evidence and preservation of basic evidence, and/or prohibiting the use of fabricated evidence. *See* Dkt. No. 27, at ¶¶99-102, 104-109. Established law holds that COB may be liable under *Monell* for its failure to adopt needed policies. A decision not to adopt a needed policy gives rise to *Monell* liability because a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick*, 563 U.S. at 61-62 (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring and dissenting in part)). "The critical question under *Monell*, reaffirmed in *Los Angeles County v. Humphries*, 526 U.S. 29 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. Applying this principle, the courts of appeals uniformly have decided that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381; *see also Fields v. City of Chicago*, 981 F.3d 534, 562-63 (7th Cir. 2020) (affirming verdict finding municipality labile for failing to promulgate needed policies requiring police to disclose evidence in the 1980s).

The First Circuit approved a comparable omission-in-policy *Monell* theory at the motion to dismiss stage in *Haley*, 657 F.3d at 51-53. Like Plaintiff here, Haley contrasted Boston's deficient evidence-disclosure policy "with that of the district attorney's office, which . . . had a standing policy

---

because "his complaint fails to allege that his harm is related in any way to a history of recurring rights violations, nor does he claim another instance of an unconstitutional withholding of evidence or improper interview that would constitution a *Monell* violation." *See Id.* at *5. In contrast, Plaintiff here alleges that COB was aware of "routine" civil rights violations stemming from BPD practices of withholding exculpatory evidence and fabricating evidence. *See, e.g.,* Dkt. No. 27, at ¶104. Plaintiff asserts that there was an "obvious" need for improved policies. *Id.*, at ¶95.

to disclose all known exculpatory and impeachment evidence. . .” *Id.* at 52; *see also* Dkt. No. 27, at

¶102. COB had failed to promulgate evidence-disclosure policies that the city knew in the early

1970s were needed to avoid the due process violations that Haley had suffered. Although COB

“vigorously dispute[d] the accuracy of these allegations,” the First Circuit held it was “neither the

time nor the place to resolve the factual disputes between the parties.” *Id.* at 52.

Thus, Plaintiff must only show that his Complaint adequately alleges that COB caused the

due process violations by failing to adopt policies COB knew it needed. The Complaint meets this

requirement. As stated above, COB failed to adopt policies requiring the disclosure of exculpatory

evidence and preservation of basic evidence, and/or prohibiting the use of fabricated evidence.

COB’s customs and deficient policies allowed its police officers to conduct unconstitutional

investigations with impunity. Plaintiff alleges that COB’s lack of sufficient policies caused Plaintiff’s

wrongful arrest and prosecution. Dkt. No. 27, at ¶¶99-102, 104-110. Plaintiff further alleges that

COB had ample notice that it needed to promulgate policies governing police conduct in these areas

but failed to do so. *Id.* The First Circuit recognized in *Haley* that the BPD’s lack of evidence

disclosure policies *in 1973* was actionable. 657 F.3d at 51-53; *see also Fields*, 981 F.3d at 562-63.

Plaintiff also properly alleges that Boston’s policy omissions caused his rights to be violated.

Dkt. No. 27, at ¶¶104, 107-110. In fact, the Officers’ misconduct was a natural cause of BPD’s

failure to institute needed guidelines about evidence disclosure, documentation, and preservation of

evidence. Regardless, causation is a classic jury question. *Union Insurance Co. v. Smith*, 124 U.S. 405,

423 (1888). Deciding that allegation at this stage is premature.

The First Circuit recognized in *Haley* that COB’s municipal policies in the 1970s, omitting

needed procedures governing police disclosure of evidence, could support a *Monell* claim. As in

*Haley*, Plaintiff’s Complaint sufficiently states a claim against COB under *Monell*.

**B.  Issue Preclusion Cannot Apply Here**

COB improperly seeks refuge behind a state court decision that lacks an extant final judgment to bar Plaintiff from raising claims related to the unduly suggestive identification procedure (though not as to any of Plaintiff's other claim such as failure to disclose exculpatory evidence under *Brady*). Doc. 30, at 12. A party seeking to invoke the doctrine of issue preclusion must establish that (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment. *Ramallo Bros. Printing v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007). Defendant COB bears the burden to prove that issue preclusion applies. *See Peterson v. U.S. Bank Nat. Ass'n*, 918 F. Supp. 2d 89, 100 (D. Mass. 2013); *OConnell v. Fed. Ins. Co.*, 484 F. Supp. 2d 223, 226 (D. Mass. 2007); *see also*, *Lundborg v. Phoenix*, 91 F.3d 265, 271–72 (1st Cir. 1996). It fails to meet this burden.

Preclusion is an equitable doctrine. *See Giragosian v. Ryan*, 547 F.3d 59, 64 (1st Cir. 2008) ("[R]es judicata should be addressed from the perspective of fairness and efficient judicial administration since the doctrine of claim preclusion is not applied rigidly where such interests would not be served."). For prior proceedings to have preclusive effect, a party must have had a "full and fair opportunity to litigate the issue in the previous action." *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012); *Allen v. McCurry*, 449 U.S. 90, 95 (1980) ("the concept of collateral estoppel cannot apply when the party . . . did not have a 'full and fair opportunity' to litigate that issue in the earlier case."). Accordingly, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. U.S.*, 440 U.S. 147, 164 (1979); Restatement (2d) Judgments §27(5)(c) (no preclusion where "the party sought to be precluded, as a result of the conduct of his adversary . . . , did not have an adequate opportunity . . . to obtain a full and fair adjudication in the initial action"). It would be

inequitable to preclude Plaintiff from challenging COB's suggestive identification procedures here.

**1. Plaintiff did not have a "full and fair opportunity to litigate" issues.**

Issue preclusion is inappropriate here because Plaintiff did not have a "full and fair opportunity to litigate the issue" at the subject motion hearings. To the contrary, Plaintiff was denied the ability to engage in full discovery regarding the violations of Plaintiff's right to disclosure of exculpatory evidence and the underlying identification procedures, which are drawn into grave doubt here by the victim herself. Because the trial court in the post-convictions proceeding relied exclusively on the *1974* trial record in deciding the issues, Plaintiff had to rely on an undeveloped record that was almost 50 years old without the benefit of discovery about the identification procedures. In fact, the Massachusetts trial courts in ruling on the motions described the source of evidence as the "same, very dated, trial record." *See* Ex. 1, 2021 Decision and Order, at 5.

The Court, therefore, lacked full evidence of the Officers' misconduct, such as the undisclosed and highly suggestive courthouse show up as described by Dr. Kane well after the criminal litigation. Dr. Kane did not testify to the Court about that improper show up as part of the motion for new trial proceedings. Accordingly, Plaintiff could not present key evidence related to BPD's identification procedures in the underlying post-conviction case and lacked the opportunity to fully litigate that issue.

Finally, the well-known requirement in Massachusetts law to uphold the outcome of a trial when deciding a motion for new trial placed an unfair burden on Plaintiff in challenging the tactics of the Officers. See Ex. 1, pp. 10-11.

**2. The new trial decisions were not final judgments on the merits.**

Even if Plaintiff had a "full and fair opportunity to litigate" the issue in state court, preclusion would still not apply because the underlying new trial decisions are not final judgments. When a conviction is vacated, there is no final determination of the facts so it cannot be given

"preclusive force either as a matter of collateral estoppel or as a matter of the law of the case." *Jackson v. Coalter*, 337 F.3d 74, 85 (1st Cir. 2003); *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985); *see also Schand v. McMahon*, 487 F. Supp. 3d 71, 77 (D. Mass. 2020). Preclusion applies only when "issues were conclusively determined in a prior action," which among other things requires that a prior judgment exist and be "final on the merits." *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010); *see also* RESTATEMENT (SECOND) OF JUDGMENTS §27 (1983) (preclusion requires a "valid and final judgment" on an "issue of fact or law actually litigated"). The Supreme Court held that §1983 did not alter these common-law rules of preclusion. *Allen*, 449 U.S. at 96-98 (1980) (noting also that the Full Faith and Credit Act, 28 U.S.C. §1738 requires "federal courts to give preclusive effect to state-court judgments") (emphasis added); accord *Migra v. Warren City School District*, 465 U.S. 75, 80-81 (1984). Thus, vacated state-court judgments cannot preclude subsequent federal §1983 actions. Further, once a court enters final judgment, antecedent interlocutory orders typically merge into the judgment and become subject to appellate review. *See Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC*, 994 F.3d 77, 82 (1st Cir. 2021); *see also Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019). In these cases, when a conviction is vacated, so too are the interlocutory rulings that preceded and supported the conviction. *See Peterson*, 931 F.3d at 554-55.

It is "hornbook law" recognized by federal courts across the country that a vacated judgment has no preclusive force. *Jackson*, 337 F.3d at 85.[6] The procedural background in *Schand v. McMahon* is illustrative. 487 F. Supp. 3d 71, 75-76 (D. Mass. 2020). Following his wrongful

---

[6] *See also Langely v. Prince*, 926 F.3d 145, 164 (5th Cir. 2019); *United Brotherhood v. Operative Plasterers*, 721 F.3d 678, 691 (D.C. Cir. 2013); *Salton v. Philips Domestic Appliances*, 391 F.3d 871, 881 (7th Cir. 2004); *Rumsfeld v. Freedom NY*, 329 F.3d 1320, 1332 (Fed. Cir. 2003); *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 624 (11th Cir. 1998); *Franklin Sav. Ass'n v. Off. of Thrift Supervision*, 35 F.3d 1466, 1469 (10th Cir. 1994); *U.S. v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984); *Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006); *O'Connell v. Alejo*, 2020 WL 1244852, at *4 (D. Colo. Mar. 16, 2020); *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 393 (N.D.N.Y. 2018).

conviction for murder, the *Schand* plaintiff sought review on multiple occasions based, in part, on police misconduct, such as doctored reports and coerced witness statements. *Id.* He appealed the superior court's denial of his motion for a new trial to the SJC, which affirmed the decision. *Id.* In 2013, a superior court granted the plaintiff's motion for a new trial based on new evidence. *Id.* In subsequent §1983 litigation, defendants argued the plaintiff was barred from contending a police report was evidence of fabrication based on a prior SJC judgment. *Id.* at 77-78. The court rejected that argument, reasoning that when a "conviction is vacated there is no final determination of the facts so it cannot be given preclusive force." *Id.* at 77.

Moreover, when assessing if a judgment was final for purposes of issue preclusion, courts consider whether "the parties were fully heard, the judge's decision [was] supported by a reasoned opinion, and the earlier opinion was subject to review." *Pellegrini v. NE. Univ.*, 323 F. Supp. 3d 182, 186-87 (D. Mass. 2018). In *Penate v. Kaczmarek*, the plaintiff sued several governmental actors under §1983 after a court granted his motion for new trial on drug-related criminal convictions. No. CV 3:17-30119-KAR, 2018 WL 4654708, at *10 (D. Mass. Sept. 27, 2018). In the civil litigation that followed, the defendants claimed that issue preclusion barred the plaintiff from asserting that a defendant police officer's misconduct was material under *Brady* because a court had already decided that issue to the contrary. *Id.* at *9. The District Court rejected the defendants' argument, explaining that the earlier decision was not final as to the relevant issue. *Id.* at *10. Specifically, the court reasoned that the criminal court granted the plaintiff's motion for a new trial based on other government misconduct. *Id.* Therefore, barring an appeal from the Commonwealth, the plaintiff could not appeal the favorable outcome based on a disagreement with a particular finding. *Id.* (citing *Commonwealth v. Graves*, 112 Mass. 282, 283 (1873) ("The defendant is not legally aggrieved by his discharge from custody, and therefore cannot appeal from the order of discharge.")).

Issue preclusion may not be invoked unless there was an available avenue for review of the

prior ruling on the issue. *Jarosz v. Palmer*, 49 Mass. App. Ct. 834, 837 (Mass. 2000); *see also Tausevich v. Bd. of Appeals of Stoughton*, 402 Mass. 146, 150 (1988) (declining to apply issue preclusion where there was no appealable judgment or order). Here, Plaintiff had no such avenue to challenge the orders granting his motions for new trial. Like the posture in *Penate*, the trial court granted Plaintiff's request for a new trial but disagreed that the trial court erred in 1974 regarding the suggestive identification techniques. Plaintiff could not appeal that favorable outcome—reversing the convictions and remanding the case for a new trial—simply because he disagreed with a specific finding.

In short, the trial court's superfluous language, not relied upon for its ultimate decision, was not a final and valid judgment on the merits that can now trigger issue preclusion.

### 3. Findings on suggestive identification tactics and/or Defendant COB's policies were not "essential" to decisions.

In Plaintiff's motions for new trial in state court, the trial courts were asked to decide something very different than the issues here. No trial court was called upon to make any decision regarding COB policies. Accordingly, no estoppel can be found generally regarding those policies.

Rather, Defendant's argument centers around vague references to the standard that the trial court was using in deciding if the problematic identification procedures would be judged by contemporary standards or those from the early 1970s. Dkt. 30, at 10-11. The Court noted in 2020 that Plaintiff there was asking the Court to retroactively apply Massachusetts law related to evolving understanding of eyewitness identification. *See*, Ex. 1, at 14 ("As ruled in the December, 2020 decision, the 1974 trial record could not support the Second Motion, to the extent that the law does not provide for retroactive application of evolving practices for obtaining and admitting eyewitness identification evidence.").

But even that question would be decided differently in state court today and, therefore, would have no preclusive effect in a Massachusetts trial court. In *Com. v. Mercado*, the Massachusetts Supreme Judicial Court found that the eyewitness identification science made available to litigants

through the SJC Study Group in 2013 and *Com. v. Gaines*, 494 Mass. 525 (2024) constituted newly

discovered evidence. 495 Mass. 763, 766-767 (2025). Accordingly, Defendant presents no valid legal

basis for its estoppel theory. Regardless, Plaintiff's arguments here raises entirely different issues—

whether BPD tactics *at the time* violated Plaintiff's right to due process at his trial and whether

Defendant's policies were the root source of those violations. The decisions related to the motions

for new trial addressed neither issue.

 Relatedly, even if the orders granting Plaintiff's motions for new trial were considered final

judgments on the merits (as opposed to the overturning of the convictions, which is the posture of a

motion for new trial decision), the court's decisions were expressly not based on any findings related

to the BPD's identification procedures, which Defendant concedes. Dkt. 30, at 10-11. Accordingly,

such findings were *not* essential to the court's final decisions and have no preclusive effect.

 Issue preclusion only bars "successive litigation of an issue of fact … resolved in a valid

court determination *essential* to the prior judgment." *Herrera v. Wyoming*, 587 U.S. 329, 342–43 (2019)

(emphasis added) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–749 (2001)). To be "essential to

the prior judgment," the issue must be essential to the merits of the underlying case. *Jarosz v. Palmer*,

436 Mass. 526, 529 (Mass. 2002). In other words, the issue must have had a "bearing on the outcome

of the case," and not "merely [have been] essential to a determination of the narrow issue before the

court at that time." *Mullins v. Corcoran*, 488 Mass. 275, 282 (Mass. 2021) (quoting *Jarosz*, 436 Mass. at

529). Issue preclusion does not preclude litigants from relitigating an issue if it was considered only

collaterally or incidentally. *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 573 F. Supp. 3d 459,

475 (D. Mass. 2021). In defining whether an issue was essential, courts ask whether it "was critical to

the judgment or merely dicta." *United States v. Reyes-Romero*, 959 F.3d 80, 94 (3d Cir. 2020) (quoting

*O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1067 (3d Cir. 1991)). If a judgment does not depend

on a given determination, re-litigation of that determination is not precluded. *Bobby v. Bies*, 556 U.S.

825, 834 (2009) "A determination ranks as necessary or essential only when the final outcome hinges on it." *Id.* at 835; *Sampson v. United States*, 832 F.3d 37, 46 (1st Cir. 2016).

Here, the trial court's decision granting Plaintiff's motions for new trial did not hinge on findings related to the identification procedures. Based on grounds unrelated to those procedures, the trial court ultimately reversed all of Plaintiff's convictions and remanded the case for a new trial. Additionally, in its opinion, the trial court simply referred to the findings from the 1974 trial record and did not engage in any additional analysis. The Court did not need to, and expressly said it would not, adjudicate the suggestive identification claims based on the 1974 record. Accordingly, the passing references to the suggestive identification techniques have no preclusive effect. Plaintiff is not precluded from challenging the identification procedures here.[7]

### C.  Plaintiff timely presented claims within two years of accrual

Plaintiff contends that his presentment of his state law claims against COB is timely based on the accrual of his claims at the time that all proceedings against him were dropped. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994); *see also Lombard v. Salisbury Police Dep't*, No. 942937B, 1995 WL 1146874, at *3 (Mass. Super. Ct. June 14, 1995). Plaintiff recognizes that the First Circuit in *Haley v. City of Boston,* 657 F.3d 39, 53-54 (1st Cir. 2011) declined to accept this similar argument.[8]

### D.  Defendant City of Boston Lacks Standing to Challenge Plaintiff's Complaint against Representatives of the Estates of the Individual Officers.

---

[7] If estoppel applies here, then Defendant should be barred later from contesting that its officers violated Plaintiff's rights under *Brady v. Maryland*. When Plaintiff pursues judgment, he will ask the Court to hold Defendant to be estopped from denying the final judgment on the merits that "BPD's actions constituted both a *Brady* violation and negligence." *See* Ex. 1 at 18; *see also*, *id.*, at 17.

[8] COB suggests that under the Massachusetts Torts Claims Act, Plaintiff was required to present his potential tort claims as early as his 1973 arrest. *See* Dkt. No. 30, at 17.  But the MTCA was not even enacted until 1978. COB's argument highlights the illogical, inequitable implications of *Haley*, as it relates to the MTCA presentment requirements. *See* 657 F.3d at 53-54. As COB interprets *Haley*, Plaintiff was required to track tort law and provide notice of a potential civil claim decades before his exoneration and, thus, decades before his claims accrued.

Defendant begins its argument relating to Plaintiff's claims against the estates of its employees but does not present any authority about how it has standing to seek dismissal or why dismissal for failure to state a claim is proper. That is likely because it admits that it does not represent those estates (Dkt. No. 30, at 6) and, therefore, lacks standing to ask for any relief. Moreover, there is no legal basis to claim that Plaintiff fails to state a claim against those estates.

There are legally appointed representatives for the estates of Farrell and Twohig. Plaintiff may, therefore, pursue claims against each regardless of any indemnification by Defendant for the actions of its employees. Because COB lacks standing or any legal basis to ask for dismissal of Plaintiff's claims, Plaintiff asks the Court to deny this extraordinary request for relief.

## CONCLUSION

Plaintiff states viable claims against Defendant City of Boston under *Monell*. His allegations put Defendant on sufficient notice of the claims. Plaintiff's claims should be allowed to proceed to discovery.

WHEREFORE, Plaintiff asks that Defendant City of Boston's motion to dismiss be denied. Should the Court believe that this motion has merit, Plaintiff asks for leave to file an Amended Complaint under Federal Rule of Civil Procedure 15(a)(2) ("The court should freely give leave when justice so requires"), to address any deficiencies in his allegations.

Dated: October 14, 2025

Respectfully submitted,

By: /s/ Mark Loevy-Reyes
Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

and

Neil D. Raphael, BBO No. 650453
RAPHAEL LLC
265 Franklin Street – Suite 1702
Boston, MA 02110
(617) 542-7900
nraphael@raphaelllc.com

ATTORNEYS FOR PLAINTIFF TYRONE CLARK

## CERTIFICATE OF SERVICE

     I hereby certify that on October 14, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties who have appeared and registered with CM/ECF.

               /s/ Mark Loevy-Reyes